UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE DZAMBASOW, | ) | CASE NO. 1:11CV1182 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE GEORGE J. |
| | ) | LIMBERT |
| v. | ) | |
| | ) | |
| | ) | |
| BRIAN BIELOZER, et al., | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| Defendants. | ) | |

This matter is before the Court on the motion for summary judgment filed on behalf of Defendants, Brian Bielozer, Officer Michael Gasdick, Chief Wayne Wozniak, and the City of North Olmstead on October 15, 2012, as well as the partial motion for summary judgment also filed on behalf of Plaintiff, Eugene Dzambasow on October 15, 2012. ECF Dkt. #68, 70, respectively. Opposition briefs were filed on November 14 and 19, 2012. ECF Dkt. #73, 74. Defendants filed a reply brief on November 28, 2012. ECF Dkt. #75.

In this 42 U.S.C. §1983 action, Plaintiff alleges that excessive force was used during his June 12, 2010 arrest by Defendants, Brian Bielozer, an off-duty North Olmstead police officer, and Officer Michael Gasdick, a North Olmstead police officer, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments (Count One). Plaintiff further contends that Defendant, Chief Wayne Wozniak ratified Bielozer's allegedly unconstitutional conduct (Count One). Plaintiff also asserts a municipal liability claim based upon the City of North Olmstead's failure to properly train Bielozer and the City's failure to properly investigate Plaintiff's allegations of excessive force (Count One). In addition to his §1983 claims, Plaintiff asserts state law claims for assault and battery (Count Two) and intentional infliction of emotional distress (Count Three) solely against Bielozer.

Plaintiff requests summary judgment solely on the excessive force claim in Count One against Bielozer. Defendants request summary judgment on all of the counts in the Complaint. Based upon Plaintiff's failure to advance any argument in his opposition brief to Defendants' motion for summary judgment, Plaintiff appears to concede that summary judgment should be entered in favor of Officer Gasdick on the excessive force claim, as it relates to Officer Gasdick, Chief Wozniak on Plaintiff's supervisory liability claim, and the City on Plaintiff's municipal liability claim, as it relates to the City's alleged failure to trial Bielozer. Having reviewed the evidence before the Court, summary judgment is warranted with respect to these claims. As a consequence, in this memorandum opinion and order, the Court will only address Plaintiff's claims that remain in dispute, that is, the excessive force claim and state law claims against Bielozer, and the municipal liability claim against the City predicated upon the failure to adequately investigate Plaintiff's allegations of unconstitutional conduct.

**I.      Standard of Review**

Summary judgment should be granted "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed.R.Civ.P. 56(c).

This Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir.2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Daugherty v. Sajar Plastics*, Inc., 544 F.3d 696, 702 (6th Cir.2008). Determination of whether a factual issue is "genuine"

requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the nonmoving party's claim. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009) (citation omitted); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n. 12 (6th Cir.1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, in order to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir.2009) (citation omitted). In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379–80 (6th Cir.2007) (citation omitted); see also *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir.2008)(citation omitted). Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348; see also *Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir.2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor

of the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348; see also Anderson, 477 U.S. at 252, 106 S.Ct. 2505 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict—whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (emphasis in original) (internal quotations omitted)).

"If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate." *Combs v. Int'l Ins. Co., 354 F.3d 568, 576* (6th Cir.2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## **II.      Facts**

The parties essentially agree to the facts leading to Plaintiff's arrest on June 12, 2010. However, the material facts surrounding the actual arrest are largely in dispute. Plaintiff returned to the City of North Olmstead in 2000, when it was determined that he was disabled and no longer able to perform his job at the National Security Agency. Plaintiff, who now lives with his parents, has a history of mental illness, which includes diagnoses of depression, panic disorder, and post-traumatic stress disorder, dating back to that time. ECF Dkt. #55 at pp. 13-14.

Plaintiff has an equally lengthy history of antisocial and sometimes violent behavior. Plaintiff has been convicted for domestic violence on three occasions (2002, 2004, and 2006), as well as aggravated assault (2001), and menacing by stalking (2009). *Id.* at 21-22. Plaintiff has also been convicted for disorderly conduct on three occasions and criminal damaging. As a result, the North Olmstead Police Department ("North Olmstead PD") has been called to the Dzambasow residence on numerous occasions. North Olmstead police have also been called by Plaintiff's parents when Plaintiff's behavior at home becomes a problem. In January of 2006, Plaintiff's parents called North Olmstead PD to transport Plaintiff to a psychiatric facility. In April of that same year, North Olmstead PD was called when Plaintiff had a physical altercation with his mother, which resulted in the 2006 domestic violence conviction. *Id.* at 32. In February of 2010, Plaintiff's parents called North Olmstead PD and Plaintiff was ultimately taken to a local hotel. *Id.* at 34.

Turning to the events that give rise to the current case, on June 11, 2010, Plaintiff rode his motorcycle to the home of a neighbor who lives on Plaintiff's street, Linwood Circle. *Id.* at 36-39. The neighbor was Bielozer's father, James Bielozer, who is a retired North Olmstead police officer. Plaintiff approached Bielozer's father to discuss his concerns about a friend that he believed was armed and a potential threat. James Bielozer instructed Plaintiff to contact his friend to determine whether he was at home.

After Plaintiff confirmed that his friend was at home, James Bielozer called North Olmstead PD. When the officers arrived, Plaintiff explained the situation and the officers informed Plaintiff that nothing could be done. Plaintiff then rode his motorcycle back down Linwood Circle to his parent's house. However, the officers followed Plaintiff into his driveway and arrested him for operating a vehicle while intoxicated ("OVI"). *Id.* at 43. During the course of the arrest, Plaintiff's drivers' license was suspended and his motorcycle was impounded. Plaintiff was taken to the North Olmstead jail and released the next morning at approximately 10:00 a.m. The OVI was ultimately converted to criminal trespassing.

At approximately 11:30 a.m. that same day, Plaintiff returned to James Bielozer's house to ask about the events that transpired the previous day. According to Plaintiff, Bielozer expressed confusion over the previous day's events and then "made an off-the-wall comment like maybe it's time for [Plaintiff] to get out of Ohio." *Id.* at 46. Plaintiff testified that James Bielozer's comment was hurtful and Plaintiff told James Bielozer that North Olmstead PD had impounded his motorcycle. Plaintiff claims that James Bielozer was apologetic, even suggesting that his son Brian had a motorcycle license and that he could retrieve the motorcycle from the tow lot and return it to Plaintiff. *Id.* at 48-49.

Plaintiff further testified that his father rented a trailer and retrieved the motorcycle from the tow yard later that day. *Id.* at 49. After dinner that evening, Plaintiff decided to ride the motorcycle around Linwood Circle to see if it had been damaged after it was impounded. *Id.* at 50. Plaintiff claims that he had a one and a half ounce shot of Scotch with his dinner that evening. *Id.* at 51.

According to Plaintiff, he hit a pothole while traveling down Linwood Circle and lost control of the motorcycle. *Id.* at 51-52. As a consequence, he drove through James Bielozer's yard, as well

-5-

as the yard of a second neighbor, before finally regaining control of the motorcycle in the yard of a third neighbor, Tom Solymos. *Id.* at 52. Plaintiff states that, while attempting to turn the motorcycle, he lost control of his footing and dropped it. As it fell, the motorcycle struck a Chevrolet HHR parked in the Solymos' driveway. The HHR was owned by Joseph Pekar. Plaintiff testified that, once the motorcycle was stabilized, he suffered a blackout that continued until he regained consciousness while riding in the ambulance to the hospital. *Id.* at 56.

Four neighbors, Michael Garrigan, Michael's son, Mark Garrigan[1], Sherry Wright[2], and her husband, Robert Wright, were on the back patio at the Garrigan residence on Linwood Circle, which is approximately four houses from the Bielozer residence. ECF Dkt. #60-1 at 9. They were startled by the sound of the motorcycle and came to the front of the Garrigan residence to determine what had happened. According to Mark Garrigan, Pekar walked out of the residence into the driveway to assess the minor damage to the HHR. *Id.* at 15. The neighbors agree that Plaintiff posed no danger to Pekar, and that the two men[3] appeared to be conversing when a truck drove into the Solymos' driveway. *Id.*; ECF Dkt. #62-1 at 16.

The truck belonged to Bielozer. According to his deposition, he was preparing to go to an off-duty job when he got a call from his neighbor's older sister, Nellie Solymos-Brotten, that Plaintiff was "turfing" his parents' lawn and several other lawns on Linwood Circle. ECF Dkt. #61-1 at 45, 47-48. Bielozer reported the incident to North Olmstead PD then drove to his parents'

---

[1]Mark Garrigan was thirty-seven years of age on June 12, 2010.

[2]Sherry Wright was approximately sixty-five years of age on June 12, 2010.

[3]Joe Pekar's deposition was not offered into evidence. According to Defendants' reply brief, Plaintiff chose not to depose Pekar, but Pekar will testify at trial consistently to the statement he made immediately following Plaintiff's arrest. The statement reads, in pertinent part:

> At that time I went to the front door + saw that [Plaintiff] was in our driveway, right next to my car (ORANGE HHR). I saw smoke coming out of his motorcycle. At this point the police showed up and detained the motorcycle driver.

ECF Dkt. #75-1 at 14.

home. *Id.* at 47-48. It is important to note that Bielozer was not in uniform, however, he claims that his badge was clipped on the waistband of his pants. *Id.* at 52.

When Bielozer arrived on the scene, he exited his truck, which he parked in the Solymos driveway. According to Bielozer, the motorcycle was on its side and Plaintiff was standing next to Tom Solymos.[4] *Id.* Bielozer further testified that Plaintiff had a cut above his eyebrow and he was attempting to pick up the motorcycle. *Id.* at 50.

Bielozer claimed that he thought Plaintiff knew him because Plaintiff had spoken to Bielozer's father a number of times, and Plaintiff "knows that [Bielozer's] car – the black and white car, the cruiser goes down to the – [Bielozer's] parent's house all the time." *Id.* Bielozer conceded that he did not tell Plaintiff that he was under arrest until after he had taken him to the ground, but that he did tell Plaintiff that he was "with the North Olmstead Police Department." *Id.* at 52. However, the neighbors did not hear Bielozer identify himself as a police officer nor inform Plaintiff that he was under arrest. ECF Dkt. ##59-1 at 19; 60-1 at 16; 62-1 at 33.

According to Bielozer, he believed that Plaintiff was intoxicated based upon the strong smell of alcohol on his breath. ECF Dkt. #61-1 at 50. As a consequence, he ordered Plaintiff to "leave the motorcycle down" and to "get down on the ground." *Id.* at 52. The neighbors, on the other hand, testified that Bielozer walked forcefully down the driveway toward Plaintiff, repeatedly yelling, "Get down on the ground!" ECF Dkt. 60-1 at 17-18. The neighbors agreed that Plaintiff did not comply with Bielozer's order, but that Plaintiff did not pose a physical threat to Bielozer**.** ECF Dkt. #62-1 at 34; 59-1 at 52. Bielozer contends that Plaintiff responded, "I'm picking up my bike.

---

[4]Tom Solymos' deposition was not offered into evidence. According to Defendants' reply brief, Plaintiff chose not to depose Solymos, but Solymos will testify at trial consistently with the statement he made immediately following Plaintiff's arrest. Solymos' statement reads, in its entirety:

> Got out of shower. Came outside saw bike on ground. Came outside. Talk to him, said he had problems with neighbor. Saw arrest. Was giving officer problem during this time. Saw officer arrest him while he was resisting.

ECF Dkt. #75-1 at 17.

-7-

Something to that effect, I'm not going to [get down on the ground.]" ECF Dkt #61-1 at 52. Bielozer added, "[Plaintiff] kind of shook his head and stared at me." *Id.* at 53.

Bielozer testified that, at that moment, he believed that he was confronted with an officer safety issue, based upon Plaintiff's intoxication and his "past physical aggressive history with [North Olmstead PD]," *Id.* at 72, and he decided that it was necessary to take Plaintiff to the ground. At his deposition, Bielozer stated that he had witnessed "two or three" North Olmstead PD confrontations with Plaintiff, including "[Plaintiff] is having a domestic. [Plaintiff] being intoxicated in the driveway. And there's another one where he was making numerous phone calls to the station that [Bielozer and another officer] went down there on. *Id.* at 73-74. Although Michael Garrigan conceded that Plaintiff was "probably drunk," he testified that there was nothing about Plaintiff's behavior that gave him the impression that he was a physical threat. ECF 59-1 at 52.

At this point, Bielozer's account of the arrest and the accounts provided by the neighbors completely diverge. According to Mark Garrigan, Plaintiff was on the ground with Bielozer standing over him, and he stated, "I don't know who you are." ECF Dkt. #60-1 at 18, 29, 32. Then, Bielozer punched Plaintiff multiple times in the face and torso. All four of the neighbors testified that Bielozer shouted, "Don't fuck with my family" several times while delivering the blows. ECF Dkt. ##60-1 at 17-18, 31; 59-1 at 35; 63-1 at 20, 26; 62-1 at 19.

Michael Garrigan testified that he saw Bielozer punch Plaintiff one time. ECF Dkt. #59-1 at 36. The Wrights both testified that Bielozer punched Plaintiff numerous times. ECF Dkt. ##62-1 at 23; 63-1 at 57. Sherry Wright testified that Bielozer was a "big boy" and that he delivered the blows with "a lot of force." ECF Dkt. #63-1 at 33.

According to Bielozer, he had to grab Plaintiff's hands and physically pull them behind his back in order to handcuff him. However, Bielozer conceded that Plaintiff was not making physically evasive movements to defeat Bielozer's efforts to control him. ECF Dkt. #61-1 at 57. Bielozer testified that Plaintiff was "passive[ly] resistan[t]." *Id.* Bielozer further testified that Plaintiff "wasn't pushing back or pulling away. He was more standing firm and failing to actually put his arms behind his back." *Id.* However, at his deposition, Bielozer did not concede to punching Plaintiff or telling Plaintiff not to "fuck with [his] family."

After Plaintiff was handcuffed, the Garrigans and the Wrights saw Bielozer attempt to bring Plaintiff to his feet.  However, while Plaintiff was being lifted to his feet, his head slammed into the HHR.  ECF Dkt. #60-1 at 19.  None of the witnesses were certain whether Bielozer pushed Plaintiff into the HHR or Plaintiff lost his footing when he was attempting to stand.

When Plaintiff stood, Michael Garrigan described him as "in pain" and "stooped over and moaning."  ECF Dkt. #59-1 at 45.  Mark Garrigan testified that there was blood on Plaintiff, Plaintiff's clothes, and the HHR.  ECF Dkt. #60-1 at 43, 52.  Michael Garrigan saw no blood on Plaintiff prior to Plaintiff's encounter with Bielozer.  Mark Garrigan walked to the Dzambasow residence in order to tell Plaintiff's father to bond Plaintiff out immediately because Garrigan feared that additional retribution might occur at the police station.  *Id.* at 56.  Sherry Wright observed that EMS workers did not examine Plaintiff very thoroughly at the scene.  She expressed concern over the limited examination due to "the severity of the punches."  ECF Dkt. #63-1 at 46.

Officer Gasdick was the first on-duty North Olmstead police officer to arrive on the scene.  ECF Dkt. #56-1 at 21-23.  According to Officer Gasdick, Plaintiff was shouting obscenities and threatening to kill Officer Gasdick and Bielozer. Officer Gasdick further testified that Plaintiff was on the ground when he arrived, and that when he attempted to lift Plaintiff to his feet, Plaintiff "went limp, basically putting all of his weight on [Officer Gasdick.]" *Id.* at 23.  As a consequence, Bielozer lifted Plaintiff's feet and the two officers placed Plaintiff in the patrol car.  *Id.* at 23-24.  Sherry Wright testified that Plaintiff looked as if he had been "hogtied."  ECF Dkt. #63-1 at 29.  Officer Gasdick informed Plaintiff that he was being arrested for OVI and driving under an OVI suspension.  ECF Dkt. #56-1 at 54, 56.

Plaintiff became agitated when he arrived at the hospital and began screaming threats at the various hospital staff members and emergency responders.  *Id.* at 25-26.  According to Plaintiff's hospital records, he was placed in four-point restraints.  Plaintiff's blood alcohol level was 244 mg/dL.  ECF Dkt. #71-1 at 2-6.  He was treated and released into the custody of North Olmstead PD and arrived at the jail at approximately 10:30 p.m.  Plaintiff ultimately pled guilty to the OVI charge.

Plaintiff testified that he sustained a collapsed lung, fractured ribs, and a laceration to the right side of his hand during the arrest.  ECF Dkt. #55-1 at 74.  Plaintiff further testified that the

-9-

alleged assault may have contributed to an inflamed biliary tract that required the insertion of a stent. *Id.*

According to Officer Gasdick, every on-duty police officer responded to the 911 call. ECF Dkt. #56-1 at 30. Several officers remained on the scene to take statements. ECF Dkt. #60-1 at 36. According to Mark Garrigan, North Olmstead PD was not interested in the truth, but, instead, encouraged the witnesses that Plaintiff needed to be locked up and sent away for a long time. *Id.* at 36-37. Mark Garrigan stated that "the police officers that came to [the Garrigans and the Wrights] were really sort of pushing for a version of events that [he] couldn't go with, saying that [Plaintiff] crashed his motorcycle into the [HHR] and stuff like that when that wasn't the case." *Id.* at 37.

### III. Law and Analysis

#### A. Section 1983 claim against Bielozer

"Every person who, under color of ... [state law], subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. §1983. "Qualified immunity," however, "shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). This doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Qualified immunity is an affirmative defense. Accordingly, the defendant bears the burden of pleading it in the first instance. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir.2008); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir.2002). Once the defendant raises qualified immunity, however, the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S.Ct. at 2083 (quotation marks omitted). "If the plaintiff fails to carry this

-10-

burden as to either element of the analysis, qualified immunity applies and the state official is proof against the plaintiff's suit." *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 494 (6th Cir.2012).

All claims that police officers used excessive force in the course of an arrest should be analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Bennett v. Krakowski*, 671 F.3d 553, 561 (6th Cir.2011) (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To determine whether an officer's use of force was objectively reasonable, we consider the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. The Court must pay "careful attention to the facts and circumstances of ... [the] case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. Throughout this analysis, the Court must remember that police officers do not sit in an ivory tower. They "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. 1865. The calculus "must embody allowance" for these difficult working conditions. *Id.* at 396-97, 109 S.Ct. 1865.

"As in other Fourth Amendment contexts . . .the 'reasonableness" inquiry. . .is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. Thus, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by *Pearson*, 555 U.S. at 236–37, 129 S.Ct. 808.

To prevail on his excessive-force claim, Plaintiff must show: (1) that Bielozer used excessive force; and (2) that, as of June 2010, it was clearly established that Bielozer's use of force was excessive. "The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be 'clearly established.' " *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir.2007). The Supreme Court recently admonished courts "not to define clearly

established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 131 S.Ct. at 2084 (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear which uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (emphasis in original).

The resolution of the excessive force claim in this case turns on the particular version of the story credited by the fact-finder, in this case, the jury. Despite the fact that both parties moved for summary judgment on this claim, the Court finds that there is a genuine dispute of material fact that precludes summary judgment. Furthermore, to the extent that the fact-finder credits the story told by the neighbors, that Bielozer threw Plaintiff to the ground before informing Plaintiff that Bielozer was a police officer and that Plaintiff was under arrest, and then pummeled Plaintiff with his fists, it is clear that a reasonable police officer would be aware of "the violative nature" of the conduct alleged. See *al-Kidd*, 131 S.Ct. at 2084. Accordingly, both motions for summary judgment are denied with respect to the excessive force claim against Bielozer.

### B. Municipal liability claim against the City

When plaintiffs seek to recover from a municipality, there is no requirement that a particular right be "clearly established," but the plaintiffs must show that the municipality itself was the proximate cause of any deprivation. See *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Ford v. County of Grand Traverse*, 535 F.3d 483, 495–96 (6th Cir.2008). There is no vicarious liability under §1983 for the alleged torts of a municipality's agents, rather: "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government entity is responsible under §1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see also *Board of County Commis. v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held

liable solely for the actions of its employee.") (citation omitted). Simply stated, to impose §1983 liability upon a local governmental body, a plaintiff must show that the municipality itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992).

A plaintiff can establish that a municipality is the proximate cause of a violation under any of five theories: (1) express municipal policy, *Monell*, 436 U.S. at 660–61, 98 S.Ct. 2018, (2) "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quotation omitted), (3) the decision of a person with final policymaking authority, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), (4) the failure to act where the "inadequacy [of the existing practice is] so likely to result in the violation of constitutional rights, that the policymaker ... can reasonably be said to have been deliberately indifferent to the [plaintiff's rights]," *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), or (5) ratification by a municipality of its employee's unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct, *Fuller v. City of Oakland*, 47 F.3d 1522, 1535 (9th Cir.1995); see also *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1247 (6th Cir.1989)

Here, Plaintiff contends that North Olmstead PD failed to adequately investigate the allegations of unconstitutional conduct that occurred on June 12, 2010. A plaintiff can establish that a municipality is the proximate cause of a violation when a municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir.1990); *Marchese v. Lucas*, 758 F.2d 181 (6th Cir.1985). A ratification claim has two elements. A plaintiff must show that "(1) a final municipal policymaker approved an investigation ... (2) ... so inadequate as to constitute a ratification of the[ ] alleged" constitutional violation. *Wright v. City of Canton*, 138 F.Supp.2d 955, 966 (N.D.Ohio.2001).

In their motion for summary judgment, Defendants contend that no internal investigation was conducted by the North Olmstead PD, and, therefore, Plaintiff cannot prove the essential elements of a ratification claim. Defendants further argue that North Olmstead PD took statements from four "witnesses" at the scene, Gerald Chomos, Tom Solymos, Mandy Pekar, and Joseph Pekar. Defendants state that all four of the witnesses will testify at trial to the contents of their written statements, and, presumably, that the testimony of the witnesses supports Bielozer's account of the arrest.

Of course, it is illogical to conclude that, when a municipality does not conduct an internal investigation of alleged police misconduct, the municipality cannot be found liable under §1983. Such a rule would encourage municipalities to turn a blind eye to alleged misconduct in order to avoid liability. However, because neither the Garrigans nor the Wrights provided statements to North Olmstead PD after Plaintiff's arrest, the Court finds that Plaintiff has failed to offer evidence that there existed conflicting accounts of the arrest that should have prompted an internal investigation. Based upon the statements of Mandy Pekar and Gerald Chomos, neither appears to have witnessed Plaintiff's arrest. Furthermore, although Joseph Pekar and Tom Solymos should be able to provide the most detailed account of Plaintiff's arrest, both men provided very vague descriptions of the events. The Joseph Pekar and Tom Solymos statements are recounted herein at footnotes three and four. Based upon the statements of all four individuals, a fact-finder could conclude that North Olmstead PD cherry-picked the witnesses, because Chomos and Mandy Pekar did not see the arrest, and Chomos described Plaintiff as an escalating menace to the neighborhood. Likewise, the statements of Pekar and Solymos are so vague that a fact-finder could conclude that, as Mark Garrigan testified, North Olmstead PD was interested in recharacterizing the events of June 12, 2010 to cover-up Bielozer's allegedly unconstitutional conduct as well as send Plaintiff to prison. However, Defendants correctly argue that neither the Garrigans nor the Wrights provided their account of the arrest to North Olmstead PD.[5] Moreover, because Plaintiff lost consciousness

---

[5] Both of the Garrigans declined to give a statement at the scene. ECF Dkt. #59-1 at 17, 43; ECF Dkt. #60-1 at 36-37.

-14-

prior to his encounter with Bielozer, there was no evidence contradicting the statements offered by Bielozer, Chomos, Solymos, and the Pekars. As a consequence, North Olmstead PD had no reason to launch an internal investigation, and, accordingly, Defendants' motion for summary judgment on the municipal liability claim predicated upon North Olmstead PD's failure to investigate Plaintiff's allegations of excessive force should be granted.

### C. State law claims against Bielozer

In Defendants' motion for summary judgment, they contend that Bielozer is entitled to sovereign immunity under Ohio law. However, individuals, unlike municipalities, do not enjoy a blanket grant of immunity under O.R.C. § 2744.02. Instead, the relevant provision of Ohio law explains that an individual is "immune from liability unless" his "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner ...." O.R.C. § 2744.03(A)(6)(b). "Wanton" misconduct refers to a failure to exercise any care whatsoever. *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35. "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 104–105, 559 N.E.2d 705, 708, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500. The term "malice" means the willful and intentional desire to harm another, usually seriously, through conduct which is unlawful or unjustified. *Hicks v. Leffler* (1997), 119 Ohio App.3d 424, 428–429, 695 N.E.2d 777, 779–780. "Bad faith" implies sinister motive that has "no reasonable justification." *Id.* at 429, 695 N.E.2d at 780. Here, if the testimony of the Garrigans and the Wrights is credited, a jury may conclude that Bielozer acted with malicious purpose, in bad faith, or in a wanton and reckless manner. As a consequence, summary judgment based upon sovereign immunity under Ohio law is not warranted.

### IV. Conclusion

Because there are genuine disputes of material facts surrounding Plaintiff's arrest on June 12, 2010, Plaintiff's motion for partial summary judgment on his excessive force claim, ECF Dkt. #70 is DENIED, and Defendants' motion for summary judgment on all of Plaintiff's claims, ECF Dkt. #68, is GRANTED in part with respect to the excessive force claim against Officer Gasdick,

the supervisory claim against Chief Wozniak, and the municipal liability claim, as it relates to the City's alleged failure to train Bielozer, and DENIED with respect to all of the remaining claims.

IT IS SO ORDERED.

SIGNED AND ENTERED on this 12th day of February, 2013.

>  */s/ George J. Limbert*
> GEORGE J. LIMBERT
> UNITED STATES MAGISTRATE JUDGE